Mr. Chief Justice, and may it please the Court. Abood should be overruled because it failed to apply heightened First Amendment scrutiny to a compulsory fee for speech to influence governmental policies. Abood's failure places it at odds with Harris, with Knox, and a slew of other speech and association precedents.   May I ask, Mr. Messenger, if you are right about agency fees, what about three things? One is student activities fees. Are they different? And if so, why? Another is mandatory bar association payments. And the third is you have a public sector case. What about the private sector agency fees compelled by State law in the private sector? Messenger Yes, Your Honor. With respect to the first two instances, the student association or student fees and the bar association fees, those cases are distinguishable for reasons stated in Harris. They are justified by different interests. The State bar associations are justified by the State's compelling government interest in regulating the practice of law before its courts. The student association fees are justified by the government's or what the university's compelling interest in setting up a viewpoint-neutral forum for speech. And then with respect to the private sector cases, they hinge on a question of State action. So in this case, only public sector union fees are being challenged. In the private sector, you would have a question of whether State action applied and, therefore, the rule of Janus would apply to that case. Sotomayor I'm sorry. I thought that we had always recognized that the government as employer had a compelling interest in regulating its employment decisions. We permit the government to fire people, deprive them of all money, not just a fair share fee, but deprive them of any income if they speak outside of the government's approved policy messages or messages generally. So if we can permit the government as employer to have a compelling interest to do something as dramatic as firing someone, why can't that interest in having workplace peace, workplace routine in which issues are decided in a collective way? Why isn't that a compelling interest comparable to the others? Well, the government's interest in restricting speech don't apply to compelling support for speech. In fact, oftentimes they cut the opposite way. So the government's interest in restricting speech, for example, in the Hatch Act, restricting political activities, wasn't preventing the politicalization of the workforce and preventing government employees from being organized into a political machine. Of course, those same interests don't justify forcing individuals to support the speech of an advocacy group. Sotomayor But that's no different than forcing student participation in fees to provide a public forum, to have a bar association regulate it. These are all forcing the subsidization of private interests for a government purpose, and the government purpose here is labor relations and labor peace. Why isn't that? You still haven't told me why that's not a compelling State interest. Well, irrespective of whether or not. Or I shouldn't say State, a compelling Federal government interest. Yes, Your Honor. The Court doesn't need to reach whether or not labor peace and to that such interests are compelling, because agency fees are not a least restrictive means to satisfy any labor peace interest the government may have in listening to one union. So the labor peace interest, as this Court has explained it in Abood, is a government's interest in listening only to one union, so it doesn't have to listen to multiple. Sotomayor Well, there's another way of doing student fees. You can have students who don't pay not participate in any student activity because of the price of being permitted to participate. You can have bar associations that the State runs. You can have alternatives of all kinds, but the question is, is the alternative that the State has chosen one that is well-fitted to its need? Is it well-tailored, narrowly tailored? I don't see how you can do that, given the interest of the government in ensuring that unions represent everybody. Well, an agency fee isn't necessary for exclusive representation. Sotomayor Why not? You have free riding. Well, the reason, Your Honor, is exclusive representation in and of itself is a valuable benefit for a union. It provides unions with extraordinary powers to compel the government to listen to it at the bargaining table, to not listen to other advocacy groups. But it drains it of resources that make it an equal partner in the bargaining setting. If you are right, then it's not only the people who are opposed to the union, but also union supporters who may think, I'd rather keep the money in my own pocket. And then you'll have a union with diminished resources, not able to investigate what it should demand at the bargaining table, not equal to the employer that it faces. Well, I think there's two things in that question, Your Honor. The first, the question is, does the duty to represent nonmembers raise union bargaining costs? And I submit that it does not. The unions – there's no reason why negotiating a contract for all employees in a unit would be more expensive than negotiating a contract just for the union members, because the union's discretion in bargaining is incredibly wide. And so the duty that the union has to the nonmembers, which it assumes over them by assuming exclusive representative authority, doesn't necessarily add any costs above and beyond what the union would already prefer. But if you're not taking into account what I suggested, that it's not just the people who oppose the union, but the people who support the union. Let's say we have a chance to get out of paying fees to the union, and so, although not for ideological reasons, we're going to pass, and we're not going to pay dues either. Well, I submit, Your Honor, it's immaterial why an individual does not wish to support union advocacy. The First Amendment prohibits the government from probing into individual subjective beliefs. Ginsburg. So you're saying that you do, then, recognize that the unions can be in a position where they will be – the resources available to them could be substantially diminished. Well, to the degree to which the union resources are diminished by individuals exercising their First Amendment right not to subsidize that union, I submit that's a perfectly acceptable result. The – Does the Constitution require States to demand that unions provide services for non-members? For example, is there a constitutional requirement for a union to handle the grievances of non-members, or is that something that's imposed by State law? It varies, Your Honor. In the Federal law, this Court implied the duty of the State law. We're talking about State law. Yes. In State law, for example, in Illinois State law, there is a provision in the Illinois Labor Relations Act that expressly provides a union for service. Yeah, I understand that. Are they – is that constitutionally required? No, Your Honor. With reference to some of the other cases to discuss, have the unions at any point in this litigation or at any point in their history ever said that they're committed to the idea of viewpoint neutrality? No, Your Honor. I wonder, since your time is limited, I have – let me say three quick questions. What you're doing basically is trying to apply a more modern framework to some older cases. This has been the law for 50 years, just about. Okay? Holmes and Brandeis didn't know about these modern framework. How many cases should we go back? Do you think we should apply modern frameworks to all old cases, begin with Marbury v. Madison? There are lots of very good lawyers in this room. They will think of all kinds of older cases where we haven't applied modern frameworks. So, one, what's your limiting principle there? Two, what is your limiting principle on the matter that we're talking about? I mean, Stewart, Justice Stewart, who wrote Abood in the 70s, thought the case is identical or near identical to the Railway Labor Act cases. Railway Labor Act, that's the railroad. They're regulated. Government's involved, just as your clients are involved, you know, just as the unions are. What's the distinction, if you're going to try to make one? And really, three, and this is for all of you, all the lawyers here, what do you think of the, what I think of as a compromise put forth by Justices Kennedy, Scalia, Souter, and O'Connor in Lerner, called to our attention specifically by the brief of Professor Freed and Professor Post? Does that solve most of your problem for any side? Those are the three. You see? Stare decisis. Even if it weren't there, how do you distinguish all the other unions, particularly those in regulated industries? And three, what about the compromise? Yes. So to address your questions in order, Justice Breyer, on the first point, Abood is not only inconsistent with cases that came after it, it was inconsistent with cases that came before it. Such as Elrod. Even the dissent in Elrod, Justice Powell, would have applied exacting First Amendment scrutiny to patronage. So Abood wasn't just a departure for, or isn't just inconsistent with prior precedent or, sorry, subsequent precedents, but the precedents that came before it. So this would not necessarily be solely applying a new doctrine to Abood, but applying what the law was even prior to Abood. With the Railway Labor Act, as this Court explained in Harris, there you have the private sector, you don't have the union dealing with government, which, of course, is political advocacy. And that political advocacy is subject to heightened First Amendment protection, which you don't necessarily have in the private sector. And then with respect to the third point, the test suggested in the dissent in Leonard, the problem with that is that it allowed for charging of collective bargaining and anything else that the government decided that the union had a duty to bargain over. So in other words, that test, the statutory duties test, allows the government to decide what is constitutionally chargeable under the First Amendment. So that test would, of course, among other things, allow for charging of collective bargaining. But here, collective bargaining is the core political activity which we submit individuals cannot be compelled to support. Sotomayor, is it just the collective nature of the union? You're not suggesting that if an employee goes to the State and tries to negotiate his or her wages, that that's a First Amendment activity. We've said it's not, right? Yes, Your Honor. But employment-related issues are not entitled to First Amendment protection, correct? Yes, Your Honor, generally speaking. So if an employee is disciplined by the State for some malfeasance, that's an employment-related issue not entitled to First Amendment protection? Oftentimes. Oftentimes. If employees come to the State and want greater training. Employment issue, correct? Generally, yes. So why does it transform into some entitlement to First Amendment protection merely because a collective body of employees are coming to the table at once? What's the transformative nature now of making these substantive questions matters of public policy? As this Court recognized in Harris, it's the scale. So here you have asked me, bargaining over issues that affect hundreds of millions of dollars and affect thousands of employees across the board, the scale of that is what makes it a political matter. It's not going to change whether the union asks for it or the employees come. What you're now saying is if the employees came into an auditorium at a business site of the State and every one of them got up and said, I want higher wages, the scale of that demand makes it protected by the First Amendment? Still a work-related demand. Well, in that hypothetical, it would arguably be a matter of public concern if there was a stage-in, you know, at a public auditorium in which the employees stood up. Well, let's not put in facts. They have permission to be in the auditorium. They walk in as a group. Every one of them gets up and says, I want higher wages. Is that an employment issue or does that now become public policy because something that every employee wants, they've now articulated? I would submit that it starts to move towards a matter of public policy if it isn't entirely public. So it's now scale, not subject. Well, it's both scale and subject. I mean, here the subject are wages, health insurance, many ways in which the government operates, which are very important both to the public fisc and to the operation and delivery of services. Mr. Messenger, may I ask you about reliance interests here? I don't think that we have ever overruled a case where reliance interests are remotely as strong as they are here. So just a few things to put on the table. Twenty-three states, the District of Columbia, Puerto Rico, all would have their statutes declared unconstitutional at once. Thousands of municipalities would have contracts invalidated. Those contracts probably cover millions, maybe up to over 10 million workers. So property and contract rights, the statutes of many states, and the livelihoods of millions of individuals affected all at once. When have we ever done something like that? What would be the justification for doing something like that? Well, I'd say two things, Justice Kagan. The first is that the prevalence of these compulsory unionism provisions isn't reason for retaining ABUD. It's reason for reversing ABUD. You have wide-scale First Amendment violations, as you said, in 23 states. Well, that would be to flip our usual stare decisis doctrine. Our usual stare decisis doctrine makes it quite clear that reliance is an important consideration on the scales. Reliance on something that's constitutional, reliance on an illegal practice, no. For example, in Arizona v. Gantt, which involved searches of cars under the Fourth Amendment, the Court said the fact this is occurring in many places across the board is a reason for reversing it. Many individuals' Fourth Amendment rights are being violated. And so in that instance, the prevalence of compulsory unionism in the states is a reason for reversing it. And then in terms of contracts in general, I submit the contracts will survive, except for the excision of the compulsory unionism provisions due to severability. Kagan. Well, why is that? How many of these contracts have severability clauses? Do you know? I couldn't find a number for the public sector, Your Honor. But the general – most contracts, at least I've seen, for anecdotal, do have severability clauses, and the general rule under the Restatement of Contracts, I think it's 184. California says the opposite. I mean, California has a whole brief there. You've read that. Of course, yes, Your Honor. So what's the answer to that? The answer, Your Honor, is that I submit they're severable in California, because they're not an essential provision of the contract that would require the excision of anything more than the clause. Kagan. Of course, even if that's true, presumably they're bargained for provisions. The contract would have been different if the unions and the employers had known that this was going to be declared unconstitutional. So to leave the contract as is, except for one particular bargained-for provision, is to do something that's inequitable for the union. Well, I don't think that's necessarily always true as a legal matter. I mean, foremost in some States, compulsory unionism is mandated by the statute. For example, in California. And in other States, once the provision is there, it stays there. So it's not even a subject of bargaining, usually. It's something that was always there from the prior contract. It's taken as an assumption. And even to the extent it was a bargained-for issue in a recent contract, these contracts will expire the next one to three years and need to be renegotiated anyways. So I don't think that really changes the reliance interests. Mr. Chief Justice, if I can reserve the remainder of my time. Roberts. Thank you, counsel. General Francisco. Mr. Chief Justice, and may it please the Court, I'd like to focus on three basic issues. The first is the government's interest in having the necessity of agency fees. The second is the stare decisis question that we've been talking about. And then the third is the Leonard issue. In terms of whether agency fees are necessary to further the compelling interest in having an exclusive bargaining representative on the other side of the table, I don't think there's really any basis for concluding that. For example, in the Federal Government, we don't have agency fees, either in the government, general, or the government. Sotomayor. We also have more benefits that are given without unions. Not in the Postal Service, Your Honor. The Postal Service. Well, that may be a different one, but isn't that the question, Mr. General, about not having a record here? It's an awful lot of assumptions that have been bantied back and forth by both sides on the actual effects of this. You're saying it's okay because the Federal Government's the same. The Postal Service is like other jobs. That's a whole lot of allegations about the reality, factual reality of things that have not been tested anywhere. Right. Well, two responses, Your Honor. First, the Postal Service does have the full range of negotiation. And in the rest of the Federal Government, I would submit that the more limited bargaining range should make it harder for them to recruit members into the union. And in fact, in the Postal Service, according to Bureau of Labor Statistics data, we find that about 94 percent of employees who are subject to collective bargaining agreements are members of the union, even though you don't have agency fees. In the Federal Government generally, including the Postal Service, that number is about 80 percent. And if you just take the Federal – the Postal Service out and look at the Federal Government, it's still north of 80 percent. That's according to Bureau of Labor Statistics data. Sotomayor, how much of the workplace is unionized in the Federal Government? I believe that in the Federal Government generally about a quarter of the workplace, a quarter to a third of the workplace is unionized. And how much is there unionization in the general corporate sector or private sector? My – I don't know for sure. I think it's on the order of – I think it's less than that, but I'm not exactly sure what the private sector rate is. In the mechanical industry, in the printing industry, and I know a lot of industries that are controlled by union. I don't have that number. No, I don't mean that in a negative sense, meaning that almost all work. And I don't have that number at the top of my head. You were trying to get to two other points? Yeah. So my other point was on the motion to dismiss issue. The need for record, this case came up on a motion to dismiss. So I think the appropriate course is as in Harris, you reverse the motion to dismiss and you send it back. Turning to the stare decisis point and particularly the reliance interests, collective bargaining agreements are generally two- to four-year contracts. So that means that almost all of them were negotiated under the shadow of Harris and Knox. So I don't think that there was an enormous amount of reliance on the continued vitality of Abood. But even if there were some reliance, I think it would be very short-lived until the next negotiating session where any new decisions from this Court would be factored in. And I do agree that there also probably wouldn't be much disruption at all, since you would simply invalidate individual agency fee provisions. Ginsburg. General Francisco, I would like you to get your answer to the question I asked Mr. Messenger and didn't have time to ask him a follow-up. Let's say you prevail in this case. What happens in the private sector? We have a doctrine you know well, Shelley v. Kramer, that says if a contract is illegal, the Court can't enforce it. Respectfully, Your Honor, I don't think anything would happen in the private sector for largely the reasons that Justice Alito identified in his Third Circuit opinion on the issue, and the D.C. Circuit identified in an opinion that I believe you were part of, which held that in the private sector there simply is no State action when it comes to collective bargaining agreements. That's also what the United States argued in its Beck-Amicus brief here a few years ago. Labor, peace. I once heard Archie Cox, maybe it was in your position right here, say the greatest instrument for labor, peace, and prosperity from the years 1945 to 1970 was grievance arbitration in the unions. So suddenly we're changing the method of financing that. You say, well, it's just public unions. But if I were in a regulated industry, and I read the Court's opinion siding with you, I would wonder if it didn't apply to me. And not all workers are lawyers. And all they've seen is that this Court has suddenly cut legs, at least one, out of the financing of a system that at least in some aspects, though it's debatable, some people think have brought labor peace. Right. Now, you are the government of the United States. What do you think about that? Well, Your Honor, I think that the core of this issue goes to, and I'm reading from the agency fee provision itself, the cost of the collective bargaining process. And that's separate from the grievance process. I actually think the grievance process raises serious First Amendment concerns as well. But for purposes of this case, the focus is on the cost of collective bargaining. And I don't think you necessarily have to go any further than that to resolve this case, since the whole idea of agency fees, their justification and their purpose has been predicated on the need to compel support for the collective bargaining process. General, an important part of Mr. Messenger's argument is the idea that all speech about employment conditions, about pay, about vacation, you know, about all of the various employee benefits that are subjects of collective bargaining that are really the heart of collective bargaining. That all speech about that is or matters of public concern when it happens in the public workplace, because they all cost money, and as taxpayers, we would be interested in things that cost money. Is that the government's position as well, that all of that speech is a matter of public concern? Yes, Your Honor. I think in the public bargaining context, all of it goes to the size, structure, cost of government, and the delivery of public services, although I would agree that there are some things that more vividly implicate public policy than others. Can I ask? I mean, it strikes me as a very unusual position for the government to be taking, looking after the long-term interests of the United States government, because essentially what that means is that you will have to litigate all employee-employer disputes under the second step of Pickering rather than under the first, which is Well, I very much disagree with that, Your Honor. I think the Pickering framework is an established framework that works very well. And the nature of individual wage disputes, the reason it rises to the level of public interest when it comes to collective bargaining agreements is because it really does all go to the overall size, structure, and the cost of the government. Pickering is very different. So you're saying that when a union collectively bargains, it's a matter of public concern, but that if employees in their workplace, 10 or 20 of them, gets together without the formal collective bargaining that a union does, that that's not a matter of public concern? Very much so, Your Honor, because when an individual employee is negotiating with his employer over his particular wage, that's a negotiation that's taking place between the employee and the employer. In the public sector collective bargaining context, it's taking place between a private third-party organization, a union, and the government in order to set the overall size, scope, and structure of the government. Well, that union is a representative of the employees and has been chosen to represent the employees so that the employees can better wield their power over terms and conditions of employment. So why should it matter? I mean, that's — I'm trying to understand this, because it struck me as a quite amazing thing for the government to be saying that these were matters of public concern. Why should it matter if 50 employees get together and say, we want higher wages? And then on the other hand, if employees get together and say, you know what, we think it's right to elect a union so that the union can say that, it's the exact same subjects and the exact same speech that's going to be involved. And I think it matters for two reasons. One is the scope of the issue, but two, and more importantly, it's the nature of pickering. Even in pickering, the government is allowed to prohibit core political speech when it interferes with the employee's ability to do their job. And that's the — Sotomayor, we're going to get into scope under the pickering test. Then the employee who, contrary to the chain of command, talks about rampant corruption in a government agency, then we're not going to permit, as we already have, that kind of thing. So the scope of that affects the public fisc in a huge way. I very much disagree with that, Your Honor. I don't understand what you're arguing. This is such a radical new position on your part. I don't think — Mr. General, by the way, how many times this term already have you flipped positions from prior administrations? Your Honor, I believe — This may be — how many? Your Honor, I think that we have revised the position in so far three cases. That's fair, regardless. What is the answer to the Justice Kagan's question? The answer to the question goes to the nature of the pickering inquiry itself. Pickering reflects the government's interest in controlling the words and actions of its employees in order to make sure they're doing their jobs. And pickering reflects the teaching that heightened scrutiny is fundamentally incompatible with that interest, since if you apply heightened scrutiny to it, you basically prohibit employers from controlling their words and actions. But there's no corresponding interest when it comes to compelling employees to subsidize third-party advocacy. Thank you, General. Mr. Franklin. Thank you, Mr. Chief Justice, and may it please the Court. This Court's case is uniformly recognized that the State has a much freer hand when it manages its personnel as an employer than when it regulates its citizens as a sovereign, and as has come up already today, that freer hand includes broad authority to put conditions on employee speech. Now, my friends on the other side this morning argue that that deference to the employer's prerogatives somehow depends on the scale or the scope of the speech in question. That has never been the law. The government is still acting as an employer when it treats with its employees as a group or as a whole. That's why this Court has repeatedly used the pickering framework and other deferential public employee tests to uphold generally applicable workplace policies. You see that in the letter carrier's case upholding the Hatch Act. You see that in San Diego v. Roe. The rule in Garcetti applies to millions of public employees around the country. Garcetti involved government speech. What we're talking about here is compelled justification and compelled subsidization of a private party, a private party that expresses political views constantly. I'm happy to speak to that, Justice Kennedy. You're right. The Garcetti case is an official duties case, and we're not arguing this case as an official duties case. However, agency fees are a condition of public employment because they pay for the workplace services, not just collective bargaining, but as Justice Breyer pointed out referencing General Cox, day-to-day workplace grievance resolution under an employment contract. All of those activities involve speech by an employee representative to an employer in employment. Kennedy, suppose that 80 percent of the fees of the union dues went to matters that were highly political in nature and 20 percent to wage and grieve — wage negotiations and grievances. Would that change your view? I don't know that it would, Your Honor. The Abboud case, the Keller case, Beck, Ellis, all of them. Then it seems to me your argument doesn't have much weight. Well, first of all, we don't know what percentage of the union's activities are wrapped up with grievances. If you — we don't have a record here. We're on a motion to dismiss. But if you look at publicly available Hudson notices that do break out categories of chargeable expenses in this way, which ours in the record doesn't happen to do, you'll find that in many cases, especially in the out years when the CBA is not being renegotiated, charges for field representatives, those are the people in — day in and day out who are doing workplace grievance work, advising employees, et cetera, can be three times, six times, seven times as much on the chargeable expenses line than the line for collective bargaining. So to decide this case in an evidentiary vacuum on the basis of assumptions about how that speech breaks down or how those expenses break down would, in our view, be irresponsible, frankly, because what you've got are — Alito, there are numerous differences between Pickering and the situation here. But let me just ask you about one. Do you think there are any limitations on the authority of the State of Illinois to compel its employees to say what the State wants them to say? And if there are limitations, what are they? If what the State wants them to say is a function of their official duties in the workplace — No, if it's not a function of their official duties, I understand you could not — you probably agree with the position you're arguing, but if you didn't, coming here representing the State of Illinois, you couldn't just argue what you like. No, my boss is right behind me. That's right. I'm acting pursuant to official duties, right? No, I understand. I've been in that situation. But aside from your official duties, are there any limitations? Yes. What I have. What the Garcetti case underlines is that when the State takes the employment relationship and exploits or leverages that relationship in such a way as to have an effect on the broader marketplace of citizen speech so that the employer interest is really pretextual, then we've got a different story. Pickering accounts for this, Justice Sotomayor. Well, let me ask you to give you a concrete situation. In Connick, an assistant district attorney, the Court held that an assistant district attorney could be fired for circulating a writing that suggested that there was a lack of confidence in the supervisors in the office, okay? It was a limitation on what she could say. Do you think the case would have been the same if the district attorney required the assistant district attorney to appear before a meeting of everybody in the office and say, I love my supervisors, they are the best supervisors anybody could possibly want? It would stay – I'll answer your question. The preface to my answer has to be, though, because I want to lay this marker down, that would still be analyzed under Pickering Step 2, okay? Under Pickering Step 2, we'd assess the strength of the State's – No. The Court says that that was a matter of – that was a subject of private concern. Well, it's possible that if you've got an Orwellian scenario where the employee is being required in the workplace to speak about matters of public concern, we would get to Step 2. What we wouldn't get to is strict scrutiny. The Petitioner wants to vault over all of the breakpoints in this Court's First Amendment law with respect to public employees and go straight to strict scrutiny. And the fact is this Court has never applied strict scrutiny to a condition of public employment that was backed by a bona fide interest that the State has as an employer. Never, not once. And I'm happy to talk about the political affiliation cases, because I don't think they are to the contrary. So, you know, implicit, I think, in your question, Justice Alito, was the distinction that my friend tried to draw between compulsion and restriction. But this Court has said again and again in Woolley, in Riley, and elsewhere, that compulsion and restriction of speech are two sides of the same coin. Alito, why won't you answer my question about what the assistant district attorney could be required to do? Throughout history, many people have drawn a line between a restriction on their speech and compelled speech. I'll give you an example that's only – that's quite different, given the nature of the subject, from what's involved here. Remember the movie in the play A Man for All Seasons? So Thomas More didn't insist on saying that he thought the act of supremacy was wrong. But he drew a line and paid for it with his life because he would not affirmatively say that it was wrong. When you compel somebody to speak, don't you infringe that person's dignity and conscience in a way that you do not? When you restrict what the person says. You do, Your Honor, in some circumstances. But what we're talking about here is a compelled payment of a fee, so it's one step removed from compelled speech. And I don't want to disparage the First Amendment interests that are at issue here. Abood recognized them. We take them seriously. But it's important to recognize that agency fees are not a man-for-all-seasons scenario by any stretch. Alito, it's not a man-for-all-seasons scenario, but I'm just asking you about the point, whether you think that compelling somebody to speak is exactly the same thing as saying you may not speak. No, it's not exactly the same, Your Honor. The pickering balance could come out differently in certain instances. I would grant you that. I do think, not to use Garcetti again, but if Mr. Ceballos had been required to write a disposition memo and it said, I won't do it, as opposed to what actually for what was in it, nothing about the logic or the outcome would change. Counsel, what is there about compelled speech? I mean, our line has drawn a big difference between compelled speech and compelled subsidy. I agree with that, Justice Sotomayor. I mean, if you look at the cases. And then we've compelled people to pay bar associations. So long as you're not compelled or stopped from speaking when you disagree, we've said that's a compelled subsidy. Bar members can come out any day they want and say they don't take the same position on a policy question as the bar association. Any union member is free to get up publicly in any setting he or she wants to say they don't agree with the position the union is taking, correct? Correct. In all of those cases, Keller, Southworth, Glickman, were outside of the workplace context, where the State has always been recognized to have paramount interests in ensuring that its managerial prerogatives can be carried out. You know, the State's interest here, if I can spend just a few moments talking about that, is first, we have an interest in dealing with a single spokesman for the employees. Second, we have an interest in imposing on that spokesman a legal duty to represent everyone. But as regards agency fees, they are complementary to those first two interests. They serve our managerial interests in two ways. First, they allow us to avoid a situation where some employees bear the cost of representing others who contribute nothing. That kind of two-tiered workplace would be corrosive to our ability to cultivate collaboration, cohesion, good working relationships among our personnel. Second, independent of that, we have an interest, at the end of the day, in being able to work with a stable, responsible, independent counterparty that's well-resourced enough that it can be a partner with us in the process of not only contract negotiation. It can be a partner with you in advocating for a greater size workforce, against privatization, against merit promotion, against for teacher tenure, for higher wages, for massive government, for increasing bondage and indebtedness, for increasing taxes. That's the interest the State has? No. The State has no interest or no overriding interest. Doesn't it blink reality to deny that that is what's happening here? With all due respect, Justice Kennedy, we've never denied that many of the topics that come up at the bargaining table with public employee unions have serious fiscal and public policy implications. We've never denied that. All right. So what about the compromise? The line that Justice Scalia drew in his Lehnert separate opinion was, in our view, superior to the one that was drawn by the plurality. We've offered a test for where to draw the line between chargeable and nonchargeable expenses that in practice would overlap with, would coincide with Justice Scalia's line in most cases. But the reason that we think that it's superior to the plurality's line is that the germaneness test does have a vagueness problem. In some instances, it allows what it shouldn't allow, which is for chargeability, for speech to the government as a sovereign. And we think a very firm line can be drawn there. Mr. Franklin, Mr. Messenger has suggested and General Francisco that if we overruled Abood, things would in a few years get back to normal. The State would pass a new statute and these municipal contracts would all be renegotiated and it wouldn't be any real issue. So could you – what do you think about that? What would the difficulties be, if any? If the State – if the Court were to overrule Abood? I'm happy to speak to that, Justice Kagan. Here's what we know, and obviously we're on a motion to dismiss. But more broadly, what we know is that tangibly, when these kinds of obligations of financial support become voluntary, union membership goes down, union density rates go down, union resources go down. We've seen it again and again. Mansour Olson spoke about it in the foundational text of behavioral economics. We also know that intangibly, there are plenty of studies that show that when unions are deprived of agency fees, they tend to become more militant, more confrontational, they go out in search of short-term gains that they can bring back to their members and say, stick with us. Well, the argument on the other side, of course, is that the need to attract voluntary payments will make the unions more efficient, more effective, more attractive to a broader group of their employees. What's wrong with that? Well, two things that I would say about that. First, the studies that I've read indicate that, yes, there can be an initial first flush of mobilization and organizing when something like this gets taken away, but that over the long term, human nature and basic economics dictate that the free rider problem will become endemic, and not only that, but contagious. Because if I'm an employee and I stick with the union and others over time decide not to, my fees and my dues are going to go up and up and up, and the pressure on me to make the same choice will increase as well. But the other point I'd make would be a legal point. This Court has said, for example, in the Connick case, that there ought to be judicial deference to the predictive judgments about workplace harm, and that in particular this is a quote from Connick, This is an area, Your Honor, where not only has this Court been, of course, aware, this Court has addressed this topic three times in the past, what, four years, but also the people around the country are addressing this issue in a very visible and sustained way. Kagan. Kagan. Mr. Franklin, I mean, you just addressed what you consider to be the harmful effects of a different rule, but I was trying to get at a slightly different question. I was asking you, even beyond that, what are the effects on, given that this rule has been in place for so long? Please. Franklin, we do think the reliance interests are serious here. Under State law, because of the severability clause, there would be State law contract issues. There might even be a duty to bargain that kicks in under State law where we would have to renegotiate not only this provision, but surrounding provisions. That's a serious reliance interest in our view. Thank you. Roberts. Thank you, counsel. Mr. Frederick. Thank you, Mr. Chief Justice, and may it please the Court. I would note at the beginning that all of these arguments were before the Court 40 years ago in Abood, and when the Court unanimously upheld the idea of agency fees, it considered whether or not these issues would constrain the constitutional prerogatives of government to act under democratic impulses to come up with a system that would fit the local culture, history, private sector background of what State governments were having to do to recruit and attract the most willing and able people to discharge the public services that public employees are required to perform. So when this Court addressed in Leonard the question of how do you draw the line between those fees that are deemed to be ideological and those that are deemed to be part of a statutorily mandated process, the Court cleaved. And the question of whether or not the statute mandated, as it does here, exclusive representation and the union is required to represent the minority members, what Justice Scalia said was it is fair to assign a fee for the services that the union by statute is required to provide. And what if the statute, what if the State statute says that lobbying is a mandatory subject of bargaining? Sotomayor Well, I think that the question, I guess, what do you mean by lobbying, Justice Alito? I'm not sure exactly what you mean. Alito Is there any limit on what States can make a mandatory subject of collective bargaining? So if the test is whether it's mandated by the State, the State can make anything it wants, a mandatory subject of bargaining. Justice Alito, I would say that that hypothetical is so far outside of what this case is really all about, that if you think that there's a problem, that if any State ever in the union would come up with some requirement like that as part of collective bargaining, you have the opportunity to review it at this time. But what we're talking about here is a system that is well settled within the States to allow for this kind of dynamic interchange for the benefit of management. Kennedy I don't think that this case affects the political influence of the unions. Sotomayor No. The reason why you have to do it is I can try to find a union newsletter which says don't worry about the Supreme Court, our political influence will be exactly the same as it was before if this case comes out against us. Sotomayor That's not a chargeable expense, Justice Kennedy. We're talking about chargeable. Kennedy I'm asking you whether or not, in your view, if you do not prevail in this case, you will have less political influence, yes or no? Sotomayor Yes, they will have less political influence. Kennedy Isn't that the end of this case? Sotomayor It is not the end of the case, Your Honor, because that is not the question. The question is, do States, as part of our sovereign system, have the authority and the prerogative to set up a collective bargaining system in which they mandate that the union is going to represent minority interests on pain of being subject to a labor practice. Kennedy I would mandate people that object to certain union policies to pay for the implementation of those policies against their First Amendment interests. Sotomayor Justice Kennedy, I would ask you to read Justice Harlan's opinion in Lathrop, where he addressed every single one of those considerations. Kennedy I read it, I think, last night between 7 and 8.30. Sotomayor It's a wonderful opinion, because what he says is that the union is going to represent minority interests on pain of being subject to a labor practice. And what he says is that the subsidization goes to the purpose of the organization, here that is State-mandated collective bargaining, and in which the person who doesn't agree with the positions basically gets two cracks. One is to try to persuade the group that he's right, and if that doesn't fail, he still has his conscience and his speech to speak outside as a citizen to explain why that position is wrong. Alito Is it possible to? Alito When I read your brief, I saw something I thought I would never see in a brief filed by a public employee union, and that is the argument that the original meaning of the Constitution is that public employees have no free speech rights. Where do you want us to go with that? Should we adopt that rule? Frederick What I would say is that what this Court, Justice White's opinion in Connick, explains that if you look at this from a question of what are the three choices before you, at the origins there were no rights. What they are asking for is basically unfettered First Amendment for public servants. And what Justice White explained was that as the First Amendment evolved, there were limitations on what the government could do with respect to certain expression, but the core principle from the founding to today is that government has a free reign in regulating expressive rights in its workplace. That principle from the founding to today is at stake here, because what they are saying is that every grievance, every employment issue becomes a constitutional issue. And Justice White's opinion in Connick says, of course, you can't run government if that becomes the principle. Alito Do you think that's a fair characterization of their argument? Frederick I do think that it is a fair characterization insofar as what they say is the collective bargaining issues that are in the contract are all raising matters of public concern. You can look at them. They are talking about who gets assignments on holidays, what are leave policies all about, things that do not affect the public fisc at all, but go to who can manage the workplace in an appropriate way where there is buy-in by the employee. Breyer Can you do that, can you limit it to wages, hours, working conditions, where mandated as subjects of compulsory bargaining by the State? Those three terms have 100 years of history written around them, shouldn't be hard to administer, and should keep the things like lobbying and so forth out of it. Frederick That's correct. And even in this statute. Breyer Is that correct? Is that what you would favor? Frederick Yes, it is. Breyer And can we get that from the conic – from the learner, Kennedy-Scalia compromise there? Frederick Yes, you can, Justice Breyer. And I would point out that the State here has carved out the questions about managerial discretion, though managerial policy cannot be bargained for, the State's budget, that can't be bargained for. So what we're talking about is how you manage the workplace. Roberts How do negotiation over wages not affect the State budget? Frederick Your Honor, what essentially happens, as I understand it, is that either the budget is set and the negotiation occurs within that parameter, or the governor takes the collective bargaining agreement to the State and the legislature decides do we ratify it or not. Roberts So the public unions do not engage in advocacy with respect to the State budget to the extent that impacts the available wages? Frederick I wouldn't put it quite that way. What I would say is that, of course, most public servants are underpaid, and I will stipulate to that before this body. And the question is, the question is how do you come to the appropriate compromises in order to achieve a system that attracts the best workers? Kennedy I just want to make sure, if I want to write something down, I'll take it. The amount of wages paid to government employees, the size of the workforce, the amount of overtime, and the existence of tenure do not affect the amount of the State budget. That's what I've got down. Frederick No. What I'm saying, Your Honor. Kennedy Isn't that what you just said? Frederick What I said is that in different States the system works differently. Sometimes the budget is set first and then the bargaining happens, and sometimes the bargaining happens, and if the legislature doesn't think it fits within the budget, they say we're not going to ratify this, or we're going to ratify the budget, you go back and renegotiate this to make it fit. Kagan Mr. Frederick, if I understood General Francisco's argument, it's that speech as to matters of pay and benefits and employment conditions and so forth are matters of public concern when they are addressed in a collective bargaining framework, but are not matters of public concern when they are addressed outside of a collective bargaining framework by individual employees. Tell me about that. What do you think of that? Frederick I don't know any case of this Court that hinges the First Amendment prerogatives of the government on the scope or manner of the speech with respect to that. And in fact, as my colleague said, when this Court upheld the Hatch Act, that applied to all workers, and the Court applied Pickering balancing to say that the government interest was sufficient to outweigh the restrictions on the employee's speech. And the Court also did the same thing. It applied the same Pickering balance when it decided that it was constitutional to have exclusive representation. That quelled the speech of the minority to the exclusion of the majority. So these are all broad sweep, broad scope principles where this Court has applied Pickering. Alito If one employee says I deserve a 5 percent raise, is that a matter of public concern or private concern? Well, it depends on whether it affects the morale of the workplace, as Justice White's opinion in Connick said. There may be a circumstance, you look at the balancing and you look at the content and the context in which that speech arises. So that, for instance, in Connick, what the Court said, the only thing that was a matter of public concern there was whether it affected the morale of the workplace. And the Court said on the basis of that, it could be a matter of public concern. But an individual worker's agitation ordinarily for pay would not raise a matter of public concern. That would be classic government workplace speech. All right. So if that's a matter of private concern, if the union demands a 5 percent wage increase for all of the employees it represents, can that be a matter of public concern? I don't think so, because no. Because what is happening in a negotiation, of course, this is a closed negotiation in a closed universe. Your hypothetical posits the opening bid by the union. And it's important to keep in mind the content and context of that speech. All negotiations between workers and management do not take place in a public forum. Alito So what if the effect of the 5 percent wage increase across the board would push a city to the brink and perhaps over the brink into bankruptcy? Would it then become a matter of public concern? Well, I think that you would look at that in terms of the context of the particular scenario. I would say, and there are briefs on our side that make this very clear, that that particular hypothetical, in fact, is an unfair smearing of the collective bargaining process. But what I would also point out is that if management says we cannot pay for this and, therefore, there is no agreement, there are State-mandated procedures to determine whether one side is bargaining in good faith or not. And if the union is taking a position that is not a good faith position, it can be subject to a State penalty. Breyer So I don't see how you can say, if one person asks for more money, that affects the budget. If one person in the railroads asks for more money, that affects the rates that a public body, the Interstate Commerce Commission, used to have to set. If one person in a public utility, an electricity company, asks for money, that affects the electricity rate. So the line can't be, I would think, whether or not you're asking for higher wages, whether collectively or individually, because they all affect the budget. So then what is the line? I had thought the line was wages, hours, working conditions is okay, and if it's not okay, then that goes way beyond just public employees, doesn't it? Frederick. And I would note that Justice Powell even had no problem in a boot with the wages hours formulation, and he was the one who disagreed with the basic formulation. Roberts Hypotheticals are asked to address a principle that can then be expanded. If one employee doesn't affect wages, do 20 percent of the workforce affect wages? I mean, negotiate or demands with respect to ages affect the public policy concerns that go into how much of a budget, as to which there are many competing demands, is allocated to employees? Frederick Your Honor, the question – I'll concede to you that there are certain matters in collective bargaining that might raise matters of public concern, but what the Court's cases say is that even if there is a matter of public concern, the government has the adequate power to restrict that speech if it can show there's justification. And Justice Scalia's opinion in Leonard provides the compelling interest by saying that the State is mandated that the union be the exclusive representative and must conduct itself through a duty of fair representation. And that's where you get the compelling interest in agency fees. Alito Well, the germaneness rule came out of Abood itself, and it was fleshed out in Leonard. So do you – are you asking – you're suggesting we should overrule Abood in part? Frederick No. What I'm suggesting is that if you were to go to this line, you should consider revisiting Leonard. That's not a question of Abood's basic correctness. Abood has been foundational precedent in a lot of different areas. Alito And didn't Abood talk about germaneness? Frederick I think Abood used the word germaneness, but what Leonard did was to give content to that, because what Abood simply said was it is constitutional for this to happen. And I'd like to turn to the reliance interest, because if the other side succeeds in persuading a majority view to overrule Abood, it will affect thousands of contracts. And more importantly, it is going to affect the work of State legislatures, city councils, school districts, who are going to have to go back to their drawing board in deciding what are the rules for negotiating and how that works. And what that means is that the key thing that has been bargained for in this contract for agency fees is a limitation on striking. And that is true in many collective bargaining agreements. The fees are the tradeoff. Union security is the tradeoff for no strikes. And so if you were to overrule Abood, you can raise an untold specter of labor unrest throughout the country. Thank you. Roberts Thank you, counsel. Two minutes remaining, Mr. Messenger. Messenger Mr. Chief Justice, just to pick up on the last point made, the proposition that agency fees are the cost that employees have to pay to prevent unions from striking, I submit, is not only extremely attenuated, but also would make agency fees effectively a form of protection money. The idea that the government needs to force its employees to subsidize unions or otherwise the unions will disrupt the government. And I submit that's not an interest that this Court can accept as a compelling one for infringing on individuals' First Amendment rights. I'd also like to make a brief point about grievance processing. We've talked a lot about collective bargaining today. But grievance processing is equally an expressive activity and in the aggregate can't have an effect upon the public fisc. Now, in terms of expressive activity, a grievance is by definition the union is trying to influence what the government wants to do, and if it's a grievance, it's something the government is resistant to actually doing. And advocacy to enforce a policy is tied into advocacy to adopt that policy. Sotomayor, you're really arguing do away with unions, because you're really taking, in essence, in saying every single employee decision is really a public policy decision. I have an individual person I want to fire or discipline. You just said it's a public policy question. No, where I was going with that, Your Honor, is that grievance as a whole is a matter of public concern. The grievances don't deal with one issue. Every grievance has a different issue. Some people are disciplined for being late. Some people are disciplined for a workplace disruption. Some for violating a dozen other workplace rules. Yes, Your Honor, but nonmembers are charged for contract administration as a whole. They're charged for an entire year's worth of AFSCME's grievance processing, some of which are very significant, like a grievance AFSCME recently filed to compel the State to expend $75 million to pay for a 2 percent wage increase. That went to the Illinois Supreme Court. Maybe some other grievances are more minor matters, as you mentioned. But as a whole, in the aggregate, they affect matters of public concern. That is what you're talking about. Sotomayor, as Justice Breyer said, every single decision affects the public fist. Every time you lose something, you, the public fist is affected. You're talking about the public fist. Roberts. Do you have a comment? Again, to go back, I think it's the scale that makes the distinction, Your Honor. Thank you, counsel. The case is submitted.